UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 6:23-po-00187-HBK-1 |
| v. | ORDER DENYING DEFENDANT'S MOTION TO DISMISS[1] |
| VALERIE TOLMOSOFF, | |
| Defendant | (Doc. No. 11) |

Pending before the Court is Defendant Valerie Tolmosoff's ("Defendant" or "Tolmosoff") Motion to Dismiss Citation Under the Second Amendment.[2] (Doc. No. 11, "Motion"). Tolmosoff was charged by Violation Notice No. E1167021 of carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation in violation of 36 C.F.R. § 2.4(c), stemming from an incident that occurred on January 16, 2023 on Northside Drive in Yosemite National Park. (*See* Doc. No. 1, the "Citation"). Tolmosoff seeks dismissal of the Citation on the grounds that the regulation violates the Second Amendment. (Doc. No. 11 at 13-16). The Government filed an Opposition. (Doc. No. 13). Tolmosoff elected not to file a Reply. On January 10, 2024, the Court heard oral argument on the Motion. The Court denies the

---

[1] This matter is assigned to the undersigned consistent with Local Rule 302(b)(3).
[2] Plaintiff's pleading also incorporates a Motion to Suppress, which the Court will address by separate order.

Motion.

**BACKGROUND**

The facts in this case are limited to those set forth in the probable cause statement in support of the Citation. While on patrol at 1230 hours on January 16, 2023, Yosemite National Park Ranger Justin Fey observed a black Cadillac obstructing traffic on Northside Drive by partially blocking the left lane of traffic in violation of 36 C.F.R. § 4.13. (Doc. No. 1-2 at 1). Ranger Fey stopped and exited his vehicle. (*Id*.). He observed one woman at the rear of the Cadillac and another woman, later identified as Valerie L. Tolmosoff, down near the Merced River. (*Id*.). Immediately upon exiting his vehicle, Ranger Fey could smell the odor of burnt marijuana in the air. (*Id*.). When Ranger Fey asked the woman standing at the rear of the vehicle if she had marijuana in the vehicle, she said that she did in the trunk of the vehicle. (*Id*.). Ranger Fey then conducted a search of the trunk and located "a loaded 'ghost' gun in a green bag inside a red clothing bag." (*Id*.). Ranger Fey noted the "magazine was loaded with 9 mm ammunition, and the magazine was loaded into the magazine well" and the "firearm did not have a serial number" and "appeared to have been privately assembled outside of a firearms manufacturer using a 'build body kit.'" (*Id*.). Tolmosoff acknowledged that the weapon was hers and that it was not registered. (*Id*.). Ranger Fey issued Tolmosoff a citation for violation of 36 C.F.R. § 2.4(c) for carrying or possessing a loaded firearm in a motor vehicle, vessel, or other mode of transport. (*Id*.).

Tolmosoff argues that under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ("*Bruen*"), 36 C.F.R. § 2.4(c) no longer survives constitutional scrutiny. (Doc. No. 11 at 13-16). In *Bruen*, the Supreme Court replaced the means-end balancing test with a new two-step framework in analyzing the constitutionality of a firearm regulation. The court first must determine whether "the Second Amendment's plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 24. If so, "the Constitution presumptively protects that conduct." *Id.* To rebut the presumption, the government must show that the challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* A firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the

1 founding era when the Second Amendment was adopted. *Id*.

2     The regulation with which Tolmosoff is charged, 36 C.F.R. § 2.4(c), states in relevant part

3 that, "Carrying or possessing a loaded weapon in a motor vehicle, vessel or other mode of

4 transportation is prohibited . . ." The provision is modified by § 2.4(a), which states:

> (a) None of the provisions in this section or any regulation in this chapter may be enforced to prohibit an individual from possessing a firearm, including an assembled or functional firearm, in any National Park System unit if:
>
> (1) The individual is not otherwise prohibited by law from possessing the firearm; and
>
> (2) The possession of the firearm is in compliance with the law of the State in which the National Park System unit is located.

11 36 C.F.R. § 2.4(a). In effect, so long as an individual transporting a firearm in a national park

12 does so in compliance with applicable state and federal law, there is no § 2.4(c) violation. The

13 Government argues, therefore, that so long as the state law(s) with which Tolmosoff failed to

14 comply are constitutional, § 2.4(c) also passes constitutional muster. (Doc. No. 13 at 4-5).

15     The Government asserts in the instant case that there are two California state laws relevant

16 for consideration of whether Tolmosoff was "in compliance with the law of the State in which the

17 National Park System unit is located." The first is California Penal Code § 25850, which largely

18 mirrors § 2.4(c) and prohibits "carrying a loaded firearm . . . in a vehicle in any public place or on

19 any public street in an incorporated city or . . . in a prohibited area of unincorporated territory."

20 The second relevant California law is the State's public carry licensing scheme, California Penal

21 Code § 26150 et seq, which provides an exemption to Cal. Penal Code § 25850 pursuant to Cal.

22 Penal Code § 26010. That provision states, "Section 25850 does not apply to the carrying of a

23 handgun by any person as authorized pursuant to Chapter 4 (commencing with Section 26150) of

24 Division 5."[3] Notably, the Government has not indicated that Tolmosoff's January 16, 2023

---

[3] Depending on the applicant's county of residence, Cal. Penal Code § 26150 provides for the issuance of either a concealed carry license, which is available in any California county, or an open carry license, available only in those counties with a population of less than 200,000 by the most recent federal census. *See* Cal. Penal Code 26150(b)(1), 26155(b)(1). *See also Baird v. Bonta*, --- F.Supp.3d ----2023 WL 9050959 (E.D. Cal. Dec. 29, 2023). Under the plain language of Cal. Penal Code § 26010, an individual possessing either a concealed carry or open carry license would be exempt from Cal. Penal Code § 25850.

citation was based on her failure to possess a California public carry license, only that such a license would have provided an exemption to enforcement of § 2.4(c).[4]  In her briefing and at oral argument, Tolmosoff does not assert that she has a California public carry license or ever applied for one.

Because possession of a public carry license provides an exemption to Cal. Penal Code § 25850, and by extension an exemption to § 2.4(c), the Government argues that so long as California's public carry licensing framework is constitutional under *Bruen*, § 2.4(c) is also constitutional.[5]  Relying on the Supreme Court's discussion of licensing schemes and the historical limitations on concealed carry in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller*"), as well as California Court of Appeal decisions finding the now-invalid "good cause" provision of California's licensing scheme severable, the Government reasons that California's public carry licensing scheme is constitutional.  (Doc. No. 13 at 4-8).  Alternatively, the Government asserts that 36 C.F.R. § 2.4(c) is lawful as an exercise of the federal government's power under the Property Clause of the Constitution (*id*. at 8-11), and that the regulations are proper because National Parks are "sensitive places" where firearms may be restricted (*id*. at 11-13).

Neither Tolmosoff nor the Government address the legality of Defendant's possession of an unregistered "ghost gun" nor whether any applicable laws governing ghost guns are Constitutional under *Bruen*.[6]  Consequently, the Court need not address these issues.  Furter,

---

The eligibility requirements for both licenses are identical.  *See* Cal. Penal Code 26150(a)(1)-(4).

[4] The California Penal Code sets forth more than a dozen other exemptions to application of Cal. Penal Code § 25850.  *See* Cal. Penal Code §§ 26000-26060.

[5] As discussed *infra*, the Court does not fully adopt the Government's premise, but agrees that the basic parameters of California's public carry licensing scheme are relevant to the constitutionality of 36 C.F.R. § 2.4(c).

[6] The Court notes that California Penal Code § 29180 regulates—but does not prohibit—the manufacture and possession of privately-made firearms, including requiring "a person manufacturing or assembling [a] firearm" to first apply to the Department of Justice for "a unique serial number or other mark of identification" before manufacturing or assembling the firearm, then engrave the serial number on the firearm within 10 days of manufacture, and finally notify the Department once the engraving is complete.  *See* Cal. Penal Code 29180(b).  At the Federal level, privately-made firearms are subject to a new Bureau of Alcohol, Firearms, and Tobacco rule that regulates their sale, purchase, and possession in the same way as standard firearms, including requiring sellers of firearm kits to be licensed, requiring serial numbers on firearm kits and background checks of purchasers.  *See* 87 Fed. Reg. 24652 (April 26, 2022).  However, a District Court in the Northern District of Texas vacated the rule in 2023 and the Fifth Circuit affirmed in

Tolmosoff does not address the constitutionality of California's public carry licensing scheme or Cal. Penal Code § 25850, nor respond to the Government's arguments in Opposition to her Motion. Instead, she merely notes in her moving brief that it is the Government's burden to demonstrate that 36 C.F.R. § 2.4(c) is constitutional under *Bruen* and argues that § 2.4(c) cannot be constitutional because "[h]istorically, persons were allowed to carry loaded weapons while in transit" citing vaguely to "numerous histories about pioneers and wagon trains moving west across the United States." (Doc. No. 11 at 13). In support, Tolmosoff cites to *Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023). In *Range*, the Third Circuit held that 18 U.S.C. § 922(g), which generally makes it unlawful for a felon to possess a firearm, was unconstitutional under *Bruen* as applied to a Pennsylvania plaintiff convicted of making a false statement to obtain food stamps in violation of state law. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 106 (3d Cir. 2023). Defendant asserts that if felons can be deemed "the people" within the meaning of § 922(g) then *ipso facto* § 2.4(c) cannot be constitutional. (Doc. No. 11 at 13).

## APPLICABLE LAW AND ANALYSIS

### A. Legal Standard

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3) specifies which motions must be made before trial and includes a motion to dismiss for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(v). A motion to dismiss is generally capable of determination if it "involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017). Defendant's Motion claiming that 36 C.F.R. § 2.4(c) is unconstitutional is a jurisdictional challenge and falls within Fed. R. Crim. P. 12(b)(3)(B)(v). *See United States v. Montilla*, 870 F.2d 549, 552 (9th Cir. 1989), *opinion amended*, 907 F.2d 115 (9th Cir. 1990) (jurisdictional claim permitted under Rule

---

part; the Government's petition for writ of certiorari is currently before the Supreme Court. *See VanDerStok v. Garland*, 86 F.4th 179, 182 (5th Cir. 2023); *see also United States v. Perez-Garcia*, 2024 WL 1151665 (9th Cir. Mar. 18, 2024) (noting that "The Second Amendment may not protect [petitioner's] right to bear or keep "dangerous and unusual weapons," which might include ghost guns or silencers or armor-piercing ammunition.").

12(b) include allegations that the appliable statute is unconstitutional); *see also United States v. Nassif*, 628 F. Supp. 3d 169, 177 (D.D.C. 2022) (charging document fails to state a claim if the charged provision is unconstitutional or otherwise does not apply to defendant's conduct).

In ruling on a pretrial motion to dismiss, "the district court is bound by the four corners of the [charging document]." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The court "cannot consider evidence that does not appear on the face of the [charging document]." *Kelly*, 874 F.3d at 1046 (citing *Lyle*, 742 F.3d at 436; *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)).

**B.  Standing**

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." *See, e.g., Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013). As the Supreme Court has observed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted). The party invoking federal jurisdiction has the burden of establishing constitutional standing. *Clapper*, 568 U.S. at 411-12; *see also Bond v. United States*, 564 U.S. 211 (2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). To establish Article III standing, a party must show an injury that is "(1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling." *Clapper*, 568 U.S. at 409 (internal quotation marks omitted). "[This] irreducible constitutional minimum" requires that the party suffer "an invasion of a legally protected interest . . ." *Lujan*, 504 U.S. at 560.

Because the Government charged Tolmosoff with a violation of 36 C.F.R. § 2.4(c), and because she is subject to a constitutional injury if convicted under a potentially invalid law, the Court concludes that she has standing to challenge the constitutionality of § 2.4(c). (*See Bond*, 564 U.S. at 226 ("Bond, like any other defendant, has a personal right not to be convicted under a constitutionally invalid law.") (Ginsburg and Breyer, J., concurring). The limited question before the Court is thus whether 36 C.F.R. § 2.4(c), as applied to Tolmosoff, violates the Second

Amendment.

### C. Discussion

#### 1. Defendant Raises an As-Applied Challenge to 36 C.F.R. § 2.4(c)

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated . . ." *Bucklew v. Precythe*, 587 U.S. ––––, 139 S. Ct. 1112, 1127 (2019). To mount a successful facial challenge, the plaintiff "must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. ––––, 141 S. Ct. 2373, 2387 (2021) (alteration in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). In other words, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew*, 139 S. Ct. at 1127; accord *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023). For this reason, facial challenges are "the most difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (alteration adopted and quotation omitted).

In their briefing, the Parties appear to agree that Tolmosoff raises only an as-applied challenge to § 2.4(c). (Doc. No. 11 at 4; Doc. No. 13 at 4). Thus, Tolmosoff's burden is to demonstrate that application of 36 C.F.R. § 2.4(c) to her was unconstitutional. As discussed further below, the Court finds that Tolmosoff fails to carry that burden.

#### 2. Case Law Regarding 18 U.S.C. 922(g)

As a preliminary matter, the Court addresses *Range v. Attorney General*, the principal legal authority cited by Defendant other than *Bruen*. For the reasons discussed below, the Court finds that *Range*, which is non-binding Third Circuit authority, is inapposite here.

Plaintiff Bryan Range had been convicted in 1995 under a Pennsylvania law, 62 Pa. Stat. Ann. § 481(a), of signing an application for food stamps, prepared by his wife, that understated his income. 69 F.4th at 98. Range's criminal history was otherwise limited to minor parking and traffic infractions and a summary offense for fishing without a license. *Id.* Because Range faced up to five years imprisonment for the offense, his conviction was considered a felony under

§ 922(g) even though he was sentenced to only fines and three years' probation. *Id*. Range sought a declaration from the district court that § 922(g) was unconstitutional as applied to him and an injunction that the law could not be enforced against him. *Id.* The District Court granted summary judgment for the Government and the Third Circuit reversed, holding that, despite Range's conviction under 62 Pa. Stat. Ann. § 481(a) he remained among "the people" protected by the Second Amendment. *Id*. at 106.

Defendant here contends that considering *Range*, § 2.4(c) *ipso facto* cannot be constitutional. First, Tolmosoff grossly misrepresents the *Range* court as holding "it is unconstitutional to prohibit felons from possessing a firearm." (Doc. No. 11 at 13). There is no such broad language in *Range*. As noted above, *Range* involved an as-applied challenge under the specific Pennsylvania statute for which Range was convicted, and the court itself noted that its ruling was "a narrow one." 69 F.4th at 104. Further, the question presented in *Range* and *United States v. Quailes,* 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023), which Defendant also cites, was whether the petitioner was one of "the people" on whom the Second Amendment confers the right to bear arms. That is not the question before this Court. *Range* and *Quailes* involve factually distinct and legally distinct issues, related in only the most limited way to the Court's review of § 2.4(c). Tolmosoff's conclusory assertion that the narrow holding in *Range* necessarily invalidates § 2.4(c) is thus wholly unpersuasive.

      3.  <u>36 C.F.R. § 2.4(c) As Applied in California is Consistent with the Nation's Historic Tradition of Firearm Regulation</u>

Tolmosoff does not otherwise articulate on what basis she challenges the constitutionality of § 2.4(c). Nor does she address the fact that § 2.4(c) is subject to numerous exemptions through the application of § 2.4(a), and thus is not a blanket ban on the transportation of a loaded weapon as her briefing implies.

While the Government does not engage in detailed historical analysis of § 2.4(c), the Court finds, based on its own review and the Government's briefing, that § 2.4(c) and § 25850 in combination with applicable exemptions, are consistent with the Nation's historic tradition of firearm regulation.

Looking to the first analytical step in *Bruen*, the Court agrees that the Second Amendment covers the conduct regulated by both 36 C.F.R. § 2.4 and Cal. Penal Code § 25850. The ability to transport firearms in a vehicle necessarily implicates the right to keep and bear arms for self-defense. Thus, the burden shifts to the Government to point to analogues demonstrating that similar regulations were widespread in the Founding era.

Read together, 36 C.F.R. §§ 2.4(a) and 2.4(c) provide that any individual transporting a loaded firearm in a motor vehicle within a national park *must do so in compliance with applicable state and federal laws*. California's parallel state law, Cal. Penal Code § 25850, similarly prohibits "carrying a loaded firearm . . . in a vehicle in any public place or on any public street in an incorporated city or . . . in a prohibited area of unincorporated territory" with more than a dozen enumerated exceptions, including for individuals holding a California public carry license. *See* Cal. Penal Code §§ 26000-26060.

As the Supreme Court noted in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Indeed, the Supreme Court in *Bruen* observed that, "Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." 597 U.S. at 38.

While finding the heightened "good cause" requirement in New York's public carry licensing scheme unconstitutional, the Court made clear that, "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes . . . which often require applicants to undergo a background check or pass a firearms safety course [and] are designed to ensure that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 38; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023) ("Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment."). Thus, while the Supreme Court found in *Bruen* no American

"tradition of broadly *prohibiting* the public carry of commonly used firearms" "well-defined *restrictions*" on the right to carry firearms in public remain constitutional. 597 U.S. at 38. (emphasis added).

Indeed, looking to regulations in effect during the relevant historical periods confirms this.[7] The right to keep and bear arms is applicable to the States through the Fourteenth Amendment, *see McDonald v City of Chicago*, 561 U.S. 742, 750 (2010), which was adopted in 1868. Noting this fact in *Bruen*, the Supreme Court expressly declined to decide "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" and observed that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

Because Tolmosoff's challenge is necessarily to both federal and state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both relevant to the Court's analysis. *See Bruen,* 597 U.S. at 4 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." (quoting *Heller*, 554 U.S. at 634–35)); *McDonald*, 561 U.S. at 778 (plurality opinion) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.").

This is consistent with the decisions of other federal courts finding "the understanding that prevailed when the States adopted the Fourteenth Amendment" is, along with the understanding of that right held by the founders in 1791, a relevant consideration. *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023); *see also Range*, 69 F.4th at 112 (Ambro, J., concurring) (observing that if the relevant period extends beyond the Founding era, "then Founding-era regulations remain instructive unless contradicted by something specific in the Reconstruction-era"); *Drummond v. Robinson Twp*., 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with

---

[7] "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right." *Bruen*, 597 U.S. at 4.

10

common weapons in areas where firearms practice was otherwise permitted."); *Ezell v. City of Chicago*, 651 F.3d 684, 702, 705–06 (7th Cir. 2011) (explaining that a "wider historical lens" is required for a local—or state—regulation, and considering evidence from both the Founding-era and Reconstruction).

*Supra*, 36 C.F.R. § 2.4(c) requires that an individual transporting a loaded firearm in a national park do so in compliance with state and federal laws, including any applicable exemptions. In effect, California—and by extension § 2.4(c)—conditions transportation of a loaded, unsecured firearm in a motor vehicle in Yosemite, at least as to California residents, on possession of a California public carry license. As determined by one scholar after conducting a broad review of historical firearm regulations, similar laws "requiring a physical license or permit to carry concealed and dangerous weapons" in public date at least to the 1860s and in fact "appear to have originated in California." *See* Brief of Amicus Curiae Patrick J. Charles in Support of Neither Party, App'x 1, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (No. 20-843) (hereinafter, "Charles Amicus Br."). The Court finds the following history instructive:

> After the state of California repealed its law prohibiting the carrying of concealed weapons except for "travelers . . . actually engaged in making a journey at the time," S , P , 1863, at 748 (1863); S , P , 1869-70, at 67 (1870), local California jurisdictions began enacting similarly worded ordinances with the notable difference of granting local government officials discretion to issue armed carriage licenses "to any peaceable person, whose profession may require him to be out at late hours of the night." Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, C 173 (1896). These licensing or permitting laws quickly spread across California, including in such cities as San Francisco, Santa Barbara, and Fresno to name a few. 4 App. I.A. at 2-12. And in 1891 the California Supreme Court upheld such a law against a state constitutional challenge, albeit not on Second Amendment grounds. *Ex Parte Cheney*, 90 Cal. 617, 621 (1891) ("It is a well-recognized fact that the unrestricted habit of carrying concealed weapons is the source of much crime, and frequently leads to causeless homicides, as well as to breaches of the peace, that would not otherwise occur.").

Charles Amicus Br. at 10. As one of many examples from the Reconstruction era, an 1892 ordinance in the City of Monterey stated that:

> Every person not being a peace officer, who shall, within the corporate limits of the City of Monterey, carry or wear any dirk, pistol, sword in cane, slung-shot or other dangerous or deadly

11

> weapon concealed, except by special permission in writing from the President of the Board of Trustees of said City, shall, upon conviction thereof before any Court of competent jurisdiction be deemed guilty of a misdemeanor . . .

App. 11 to Charles Amicus Br. Indeed, similar laws regulating public carry spread to states and municipalities throughout the nation in the decades surrounding the ratification of the Fourteenth Amendment: Kansas; Milwaukee, Wisconsin; Lincoln, Nebraska; St. Paul, Minnesota; New Haven, Connecticut; and Wheeling, West Virginia, to name a few. Charles Amicus Br. at 11-12.

While not identical, 36 C.F.R. § 2.4(c) and Cal. Penal Code § 25850 are fundamentally like these Reconstruction-era firearm regulations. The state law probits transporting a loaded, unsecured firearm in a motor vehicle absent an exemption, such as possession of a California public carry license. The federal regulation essentially mirrors the state law,[8] and thus conditions transportation of a firearm on compliance with state law. The 19th century precursors likewise criminalize carrying a concealed weapon in a particular city, county, or state without a license to do so. The purpose of both the 19th century and modern statutes is the same—to ensure that those who carry firearms in public are responsible, law-abiding citizens.

In the case of California's public carry licensing scheme, this includes ensuring the applicant is not disqualified on account of factors such as (1) being a danger to oneself or others; (2) being subject to a restraining order or protective order; (3) having been convicted in the preceding 10 years of certain serious offenses; (4) having "engaged in an unlawful and reckless use, display, or brandishing of a firearm"; and (5) having been incarcerated or released on probation or parole in the preceding five years following conviction for "an offense, an element of which involves controlled substances." *See* Cal. Penal Code § 26202 (setting forth disqualifying factors for those applying for a public carry license). Similarly, New York's 1878 concealed-carry ordinance explicitly cited the concern that the disorderly and the intoxicated were going about carrying pistols, "insult[ing] respectable citizens, and draw[ing] a pistol on any and every occasion, while the better and law-abiding class try to obey the laws and protect themselves

---

[8] As noted above, the issue is not before the Court whether an individual visiting a National Park, and lawfully in possession of a firearm under the laws of another state, would be subject to enforcement of § 2.4(c), and the Court does not opine on the constitutionality of such an application.

with nothing but nature's weapons." *Antonyuk*, 89 F.4th at 322 (citing New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York, committee report) ("As to the necessity for the passage of the ordinance there can be no question.  The reckless use of firearms by the dangerous classes in this city is proverbial, and this measure of repression seems to be necessary.").

Historians appear to agree that licensing schemes were a post-Civil War phenomenon, largely due to the development of urban centers, professional police forces, and administrative agencies. *See, e.g.*, Brief of Amici Curiae Profs. of Hist. & L. in Supp. of Resps. at 22, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("In the latter half of the nineteenth century, many municipalities also began to enact licensing schemes, pursuant to which individuals had to obtain permission to carry dangerous weapons in public."); Charles Amicus Br. at 7–9; Saul Cornell, "History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?", 49 HASTINGS CONST. L.Q. 145, 168–71 (2022).  Thus, the historical record does not yield examples of public carry licensing in the Founding Era.  However, as the Supreme Court acknowledged in *Bruen*, "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" and thus "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27.  The mid-to-late 19th century saw "technological advancements in both firearms and travel" that introduced regulatory challenges unknown to the Founders[9] but that are familiar to us today—mass transportation, dense urban centers, national parks seeing millions of annual visitors.  While the regulatory solutions introduced during Reconstruction differed in kind from those of the Founding Era, they reflected the common desire to ensure that "those bearing arms in [a] jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38.  Thus, the license-based regulation on transporting loaded firearms set forth in § 2.4(c) and

---

[9] Patrick J. Charles, "The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes," 13 Charleston L. Rev. 125, 148 (2018)

13

1 § 25850 are both consistent with the Nation's historic tradition of firearm regulations designed to
2 protect order and public safety.

3 Nothing in *Bruen* suggests that a firearm licensing scheme, as a general matter, is per se
4 unconstitutional, and indeed the Supreme Court explicitly rejected such an interpretation. *See*
5 *Bruen*, 597 U.S. at 38, n. 9; at 79 ("the Court's decision does not prohibit States from imposing
6 licensing requirements") (Kavanaugh concurrence).  Further, California's public carry scheme, as
7 modified by the California Attorney General's Memorandum, has already survived one
8 constitutional challenge under *Bruen*.  *See Baird*, 2023 WL 9050959 (noting that the Attorney
9 General's instruction "mooted any dispute about California's former 'good cause' law) (citing
10 *Flanagan v. Bonta*, 2023 WL 1771160 (9th Cir. Feb. 1, 2023) (dismissing a challenge to the
11 "good cause" requirement as moot).

12 Accordingly, because the Court concludes both 36 C.F.R. § 2.4(c), as modified by
13 § 2.4(a), and Cal. Penal Code § 25850, as modified by § 26010, are consistent with this Nation's
14 historic tradition of firearm regulation, Defendant fails in her as-applied challenge to § 2.4(c).

15     4.   <u>The Property Clause and Sensitive Places Doctrine Do Not Alter the Analysis</u>

16 In the alternative, the Government asserts that an additional reason to deny Plaintiff's
17 Motion is because the Property Clause of the Constitution provides Congress the power to "make
18 all needful Rules and Regulations respecting the Territory or other Property belonging to the
19 United States." U.S. Const., art. IV, § 3, cl. 2.  This includes regulations over federal property
20 enacted to "control their occupancy and use, to protect them from trespass and injury, and to
21 prescribe the conditions upon which others may obtain rights in them . . ." *Utah Power & Light*
22 *Co. v. United States*, 243 U.S. 389, 405 (1917).

23 In one Fourth Circuit case, the court upheld a predecessor of 36 C.F.R. § 2.4(c) against
24 constitutional challenge, relying on part on the Property clause. *See U.S. v. Masciandaro*, 638
25 F.3d 458, 473 (4th Cir. 2011), abrogated by *Bruen*, 597 U.S. 1.  However, the court's Property
26 clause analysis was intertwined with a pre-*Bruen* analysis finding that "the government has a
27 substantial interest in providing for the safety of individuals who visit and make use of the
28 national parks." *Id.*  Thus, the Court disagrees with the Government's position that the

*Masciandaro* court's Property Clause reasoning can be divorced from the Fourth Circuit's now disavowed means-ends analysis.

Moreover, federal statutes enacted pursuant to the police power vested in Congress by the Property Clause remain subject to constitutional scrutiny. *See, e.g., Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 253 (1991) ("Nor is there merit to petitioners' contention that the Board should nevertheless be immune from scrutiny from constitutional defects because it was created in the course of Congress' exercise of its power to dispose of federal property under Article IV, § 3, cl. 2."). Thus, 36 C.F.R. § 2.4(c), even if justified pursuant to Congress' police powers under the Property Clause, must survive the scrutiny prescribed in *Bruen*.

The Court likewise does not find the so-called "sensitive places" doctrine alters the analysis here. In *Bruen*, the Court affirmed the recognition in *Heller* that "States may forbid public carriage in 'sensitive places'" such as "legislative assemblies, polling places, and courthouses." 597 U.S. at 30. It also noted that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id*. However, it specifically declined to adopt the position that sensitive places are anywhere "people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 30-31.

The lower court in *Masciandaro*, upholding the predecessor to 36 C.F.R. § 2.4(c), held that:

> National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities. Moreover, the locations within National Parks where motor vehicles travel—roads and parking lots—are even more sensitive, as roads and parking lots are extensively regulated thoroughfares frequented by large numbers of strangers, including children. Thus, unlike a home or other private property, where the "need for defense of self, family, and property is most acute," the locations in National Parks where vehicles travel, like schools and government buildings, are sensitive places where the Second Amendment leaves the judgment of whether (and if so, how) to regulate firearms to the legislature, not the judiciary.

*United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), aff'd, 638 F.3d 458 (4th Cir. 2011). However, the Fourth Circuit's opinion affirming this ruling was abrogated by *Bruen*, thus this characterization of national park roads as "sensitive places" is no longer good law.

Similarly, in the 2009 case *Nordyke v. King*, the Ninth Circuit upheld a county ordinance prohibiting carrying firearms on "open space venues, such as County-owned parks, recreational areas, historic sites, parking lots of public buildings . . . and the County fairgrounds," in large part because the court believed that large gatherings of people made them sensitive places in the same category as schools and government buildings. *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), but the opinion was vacated after the Supreme Court's opinion in *McDonald*. Thus, this broader definition of sensitive places as recreational spaces where large groups gather is no longer tenable.

Indeed, given the narrow-accepted definition of "sensitives places" the Court is skeptical of designating an entire National Park—in this case one measuring nearly 760,000 acres or 1,200 square miles[10]—a sensitive place. Some pre-*Bruen* cases have allowed regulations on firearms to extend to the area immediately around a sensitive place—such as school zones, *United States v. Redwood*, 2016 WL 4398082 (N.D. Ill. Aug. 18, 2016), post office parking lots, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015), and a parking lot 1,000 feet away from the entrance to the U.S. Capitol and a block from the Rayburn House Office Building, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), abrogated by *Bruen*, 597 U.S. 1. While Yosemite National Park arguably may contain sensitive places, i.e., the Yosemite Court, government buildings and schools, "the Court is aware of no case suggesting that properly designating one location a 'sensitive place' allows the government to give the same designation to a different, non-adjacent location." *See Solomon v. Cook County Bd. Of Comm'rs*, 559 F.Supp.3d 675, 693-94 (N.D. Ill. 2021) (rejecting designation of entire state forest, comprising 70,000 acres and at least 320 distinct areas, as a sensitive place). And because the Government has not established that the location where Tolmosoff was arrested in possession of a loaded weapon was a "sensitive place" within the accepted definition of that term, the Court declines to find that the challenged

---

[10] *See* https://www.nps.gov/yose/learn/management/statistics.htm (last visited: February 29, 2024).

1  regulation should be upheld on that basis alone.

2        Accordingly, it is **ORDERED**:

3        Defendant's Motion to Dismiss Citation Under the Second Amendment (Doc. No. 11) is

4  DENIED.

6  Dated:   April 11, 2024

7                                          HELENA M. BARCH-KUCHTA
                                        UNITED STATES MAGISTRATE JUDGE